# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

WILLIE C. SIMPSON,

        Plaintiff,

        v.                              Case No. 06-C-200

MANUEL JOSEPH, SUSAN NEIL,
QUALLA CHAMPAGNE,
RON MOLNAR, MATTHEW J. FRANK,
SUSAN NYGREN, JENNIFER MIKUTIS,
and WENDY CRAMER,

        Defendants.

---

## ORDER

The plaintiff, Willie C. Simpson, who is proceeding *pro se,* is presently incarcerated at the Green Bay Correctional Institution ("GBCI"). By order of April 13, 2006, the plaintiff's complaint was screened pursuant to 28 U.S.C. § 1915A(a) and he was allowed to proceed *in forma pauperis* on two claims: (1) a First Amendment access to courts claim involving an appeal of the denial of his habeas petition against defendant Wendy Cramer; and (2) a right to privacy claim concerning his medical information against the remaining defendants. Presently before the court is a motion for summary judgment filed by the plaintiff and a motion for summary judgment filed by the defendants. For the reasons set forth below, the defendants' motion for summary judgment will be granted and the plaintiff's motion for summary judgment will be denied.

# I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-71 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial–(1) the absence of a genuine issue of material fact, and (2) an entitlement to judgment as a matter of law–is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Anderson*, 477 U.S. at 267; *see also, Celotex Corp.*, 477 U.S. at 324 (*proper* summary judgment motion [may] be "opposed by any of the kinds of evidentiary materials listed in Rule 56[c], except the mere pleadings themselves . . ."); (emphasis added). ("When a summary judgment motion is made and supported as provided in [Rule 56(c)], . . . the adverse party's response, by affidavits or as otherwise provided in [Rule 56(c)], must set forth specific facts showing that there is a genuine

2

issue for trial.")  Fed. R. Civ. P. 56(e).  "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  Thus, in considering a motion for summary judgment, the court may consider any materials that would be admissible or usable at trial, including properly authenticated and admissible documents.  *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000).

In evaluating a motion for summary judgment, the court is obliged to draw all inferences in a light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, the court is "not required to draw every conceivable inference from the record–only those inferences that are reasonable."  *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

The fact that both parties have moved for summary judgment, and thus both parties simultaneously are arguing that there is no genuine issue of fact, does not establish that a trial is unnecessary or empower the court to enter judgment as it sees fit.  *See* 10A Charles Alan Wright, et al. § 2720 at 327-28 (3d ed. 1998). The court may grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law on the basis of the material facts not in dispute.  *See Mitchell v. McCarty*, 239 F.2d 721, 723 (7th Cir. 1957).  Cross motions for summary judgment do not convert a dispute into a question of law if material factual questions are involved and

3

additional evidence may be adduced at trial which would be helpful in the disposition of the case. *See M. Snower & Co. v. United States*, 140 F.2d 367 (7th Cir. 1944). Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. The fact that one party fails to satisfy that burden on its own motion does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright, et al. § 2720 at 335.

## II. RELEVANT UNDISPUTED FACTS

Before setting out the relevant facts which are based upon consideration of the parties' submissions, the court notes that Civil L.R. 56.1 (E.D. Wis.) sets forth requirements for summary judgment motions in *pro se* litigation. Specifically, Civil L.R. 56.1(a)(1) provides that when the party opposing the *pro se* litigant files a motion for summary judgment "any factual assertion in the movant's affidavit(s) or other admissible documentary evidence will be accepted by the Court as being true unless the party unrepresented by counsel submits the party's own affidavit(s) or other admissible documentary evidence contradicting the factual assertion."

An affidavit submitted to support or oppose a summary judgment motion must be based on personal knowledge, must set forth facts that would be admissible at time of trial, and must establish the affiant's competence to testify. Fed. R. Civ. P. 56(e). Affidavits based on "information and belief"–facts that the affiant believes are true, but

4

which the affiant does not know are true–are not proper.  *Toro Co. v. Krouse, Kern & Co., Inc.*,  827 F.2d 155, 162-63 (7th Cir. 1987); *see also Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987) (The court should disregard an affidavit that does not comply with the requirements of 56(e)).

Turning to the specifics of this case, the court notes that the plaintiff objects to a number of the defendants' proposed findings of fact.  However, many of the plaintiff's objections are insufficient to raise a factual dispute as to the proposed finding of fact because they do not comply with Fed. R. Civ. P. 56(e).  To the extent the plaintiff's submissions do not comport with Rule 56 and do not raise a factual dispute, they are not included in the following sections.

## A. Defendant's Proposed Findings of Fact

At all times relevant to this action, Mr. Simpson was incarcerated at the Racine Correctional Institution (RCI).  (Defendants' Proposed Findings of Fact [DPFOF] ¶ 1.) During this time, defendant Manuel Joseph, was employed as a physician at RCI. (DPFOF ¶ 2.)  As such, his duties involved providing medical care to RCI inmates through the RCI Health Services Unit (HSU).   (DPFOF ¶ 3.)

Defendant, Susan Neil, is and at all relevant times was employed as a "Nurse Clinician 2" at RCI.  (DPFOF ¶ 4.)  Her duties included providing skilled nursing care to incarcerated adults confined at RCI such as patient assessment and treatment, assisting the physician in providing medical services, management of medications and provision of emergency care and maintenance of medical records.  (DPFOF ¶ 5.)

5

At all times relevant to this action, defendant Quala Champagne was employed as the Warden at RCI. (DPFOF ¶ 6.) Her duties are set forth in the Wisconsin Statutes and the Wisconsin Administrative Code. (DPFOF ¶ 7.) Defendant, Ron Molnar, is and was during the relevant time period employed as the Corrections Security Director at RCI. (DPFOF ¶ 8.) He is responsible for administering and supervising the security program for RCI. (DPFOF ¶ 9.) To this end, he plans security program changes, directs the assignments of subordinate staff, recommends security policy to the Deputy Warden and Warden, and also interacts closely with all other department heads. (DPFOF ¶ 9.)

Defendant Matthew J. Frank is and at all times relevant to this action was the Secretary of the Wisconsin Department of Corrections (DOC). (DPFOF ¶ 10.) Defendant Frank's duties are set forth in the Wisconsin Statutes and in the DOC rules. (DPFOF ¶ 11.) Defendant Susan Nygren, is and at all times relevant to this action was employed as the Nursing Supervisor at RCI. (DPFOF ¶ 12.) In this position, defendant Nygren acts as the Health Services Manager and as the Administrative Manager of the correctional facility's HSU. (DPFOF ¶ 13.) Her responsibilities include working with the primary care physician, dentist, psychiatrist and the specialists who serve as consultants to the Bureau of Health Services and providing the overall administrative support and direction of the HSU. (DPFOF ¶ 13.)

Defendant Jennifer Mikutis is and at all relevant times was employed as an Institution Complaint Examiner (ICE) at RCI. (DPFOF ¶ 14.) As such, her duties are

set forth in Wis. Admin. Code ch. DOC 310. (DPFOF ¶ 15.) In general, when inmates file Inmate Complaint Review System (ICRS) Offender Complaints, her job is to process them under §§ DOC 310.03(10), DOC 310.04, DOC 310.07, and DOC 310.09–DOC 310.11. (DPFOF ¶ 15.)

Defendant Wendy Cramer is and at all relevant times was employed as the Librarian at RCI. (DPFOF ¶ 16.) If an indigent inmate requests a federal court form (such as an AO 240 form) which defendant Cramer has on file in the library, the library will supply the inmate with a copy of the form free of charge. (DPFOF ¶ 20.)

Brenda M. LaBelle is employed by DOC as an ICE at RCI. (DPFOF ¶ 47.) In this position, Ms. LaBelle is a custodian of the regularly conducted records of the ICRS at RCI concerning Offender Complaints about conditions of confinement at RCI filed by its inmates. (DPFOF ¶ 47.) Ms. LaBelle is also a custodian of other regularly conducted business records of RCI concerning inmates confined there. (DPFOF ¶ 47.)

In order to exhaust an inmate's administrative remedies under the ICRS, a RCI inmate must first file an Offender Complaint with Ms. LaBelle's office, as set forth in Wis. Admin. Code ch. DOC 310. (DPFOF ¶ 48.) The inmate must then follow the remaining procedures set forth in Wis. Admin. Code ch. DOC 310 to exhaust his administrative remedies. (DPFOF ¶ 48.)

According to Ms. LaBelle, as of February 17, 2006, (the date on which plaintiff's complaint was filed), the plaintiff had not filed an ICRS Offender Complaint with her office raising any claim that RCI librarian Wendy Cramer had failed to provide him with

7

case law, copies of case law, federal court forms, or other documents or copies of documents for appealing an adverse decision on his habeas corpus case. (DPFOF ¶ 49.)

Deborah A. Seitz is employed by DOC as the Offender Records Supervisor at RCI and, as such, she is a custodian of the regularly conducted business records of RCI concerning inmates confined to that institution. (DPFOF ¶ 40.) The regularly conducted business records of RCI indicate that the plaintiff was transferred from RCI to GBCI on July 20, 2006, and he has not returned to RCI since that time. (DPFOF ¶¶ 41 and 42.) Ms. Seitz has not been informed, nor is she otherwise aware, that the plaintiff will be transferred out of GBCI back to RCI. (DPFOF ¶ 43.)

Susan A. Schmeichel is employed by DOC as the Offender Records Supervisor at GBCI and is a custodian of the regularly conducted business records of GBCI concerning inmates confined to that institution. (DPFOF ¶ 44.) The regularly conducted business records of GBCI also indicate that the plaintiff was transferred to GBCI on July 20, 2006, from RCI. (DPFOF ¶ 45.) She has not been informed, nor is she otherwise aware, that the plaintiff will be transferred from GBCI back to RCI. (DPFOF ¶ 46.)

Defendant Mikutis personally handled three of the plaintiff's ICRS Offender Complaints related to medical appointments in 2005: Offender Complaint ## RCI-2005-26758, RCI-2005-27871 and RCI-2005-29785. (DPFOF ¶¶ 56-58.) After receiving any ICRS Offender Complaint, defendant Mikutis determines if it should be rejected for one

8

or more of a number of reasons, including that the issue has already been raised through the inmate's prior use of the ICRS. (DPFOF ¶ 52.) If she rejects an ICRS Offender Complaint, the inmate has a right to appeal the rejection to the appropriate reviewing authority, who makes the final decision on the rejected complaint. (DPFOF ¶ 52.)

If defendant Mikutis does not reject the inmate's ICRS Offender Complaint, she uses her discretion in investigating the Offender Complaint and makes a recommendation on it to the appropriate reviewing authority. (DPFOF ¶ 54.) The appropriate reviewing authority makes the final institution level decision on the ICRS Offender Complaint; not defendant Mikutis as the ICE. (DPFOF ¶ 55.)

Defendant Mikutis recommended that plaintiff's ICRS Offender Complaint # RCI-2005-26758 should be dismissed for the following reasons:

> I/M Simpson is housed in segregation. Therefore, his status has resulted in him being under staff escort at all times due to an assumed security risk. This practice is a job-related duty of staff. The officer(s) is prohibited by law from communication [sic] any health information to others. Furthermore, staff are trained and tested regarding HIPPA law.

(Affidavit of Jennifer Mikutis, Ex. E.) The appropriate reviewing authority accepted this recommendation, with modification as follows:

> The ICE stated that the inmate presents an "assumed" security risk because of being in segregation status. A case by case assessment of the risk of physical harm to self and others should be made in each situation as inmates can be placed in segregation without a past or present risk of harm to self or others.

9

(Affidavit of Willie C. Simpson, Ex. 12 at 2.) The plaintiff then appealed the dismissal to the Correctional Complaint Examiner who agreed that the complaint should be dismissed as modified. (Simpson Aff., Ex. 13.) Thereafter, the Secretary's designee affirmed the dismissal as modified. (Simpson Aff., Ex. 13.) Defendant Mikutis rejected plaintiff's ICRS Offender Complaint #RCI-2005-27871 because the issue advanced in that complaint had been raised by the plaintiff in #RCI-2005-26758. (DPFOF 57.) Warden Champagne, as the reviewing authority, affirmed the rejection of Offender Complaint #RCI-2005-27871. (Simpson Aff., Ex. 14.)

In Offender Complaint #RCI-2005-29785, the plaintiff complained that the Security Director or other security staff disclosed his medical information to another inmate. (Mikutis Aff., Ex. G.) Defendant Mikutis recommended that this complaint be dismissed for the following reasons:

> The complaint is presented by the complainant on pure speculation or second-hand information. He is merely guessing that security staff have shared his medical information with other inmates because they have escorted him to medical appointments. He cannot specifically identify one individual or incident in which this has happened. He states "one officer told me this" but he has also failed to identify that individual. He has failed to provide any evidence to support this allegation.

(Mikutis Aff., Ex. G.)

Defendant Mikutis was not present at any medical appointment which involved the plaintiff. (DPFOF ¶ 59.) Defendant Mikutis does not participate in setting security policy at RCI and she did not participate in any determination whether the plaintiff's security needs made it necessary for RCI security officers to be present during any of

10

the plaintiff's medical appointments. (DPFOF ¶¶ 60-61.) Security decisions like these are made by institution security personnel. (DPFOF ¶ 62.)

Prior to receiving the plaintiff's ICRS Offender Complaints concerning his medical appointments, defendant Mikutis did not know of the plaintiff's medical condition and she never disseminated details of that condition to anyone. (DPFOF ¶ 63.) After she received the plaintiff's ICRS complaints concerning his medical appointments, defendant Mikutis discussed the plaintiff's medical appointments with RCI staff only to the extent necessary to carry out her duties as an ICE. (DPFOF ¶ 64.) Pursuant to § DOC 310.16, the ICRS is confidential with only limited exceptions. (DPFOF ¶ 65.) Defendant Mikutis has no intention of disseminating details of the plaintiff's medical condition to anyone in the future, except as may be necessary to defend this case. (DPFOF ¶ 66.) Defendant Mikutis did not harm the plaintiff nor did she intend to do so. (DPFOF ¶ 67.)

In defendant Neil's position as a Nurse Clinician at RCI, she does not set, nor does she have any control over, security policy at the institution. (DPFOF ¶ 68.) Defendant Neil has no expertise in the area of prison security to secondguess determinations concerning an inmate's security needs, including whether an inmate safely may be unescorted during a medical appointment. (DPFOF ¶ 72.)

Rather, security policy at RCI is set by the RCI Security Department, of which defendant Neil is not a member. (DPFOF ¶ 69.) The RCI security staff determines the security needs of inmates at the institution. (DPFOF ¶¶ 70 and 116.) This includes

11

whether an RCI inmate requires mechanical restraints and escorting by security staff when the inmate is out of his cell, and during medical appointments in the HSU at RCI. (DPFOF ¶¶ 70 and 116.)  If security staff determines that an inmate's security needs require that he be escorted by security staff during a medical appointment, HSU staff must comply with this determination.  (DPFOF ¶ 71.)

An escorting security officer may hear conversations between HSU staff and an inmate incidental to the security officer's duty to remain in close proximity to the inmate in the examining room during a medical appointment in the HSU.  (DPFOF ¶ 73.)  It is the expectation, as well as DOC policy, that security officers not disclose or disseminate any medical information contained in conversations between HSU staff and inmates.  (DPFOF ¶ 74.)  Indeed, security officers are subject to discipline if they disclose or disseminate such medical information.  (DPFOF ¶ 75.)

Defendant Neil has not disseminated medical information about the plaintiff except as necessary to carry out her official duties.  (DPFOF ¶ 76.)  She did discuss plaintiff's medical condition with him during his medical appointment while security staff were escorting him.  (Reply to Plaintiff's Resp. to DPFOF ¶ 76.) Defendant Neil did not inform other inmates of the plaintiff's medical condition nor did she harm the plaintiff or intend to harm him.  (DPFOF ¶¶ 80-81.) Defendants Neil, Nygren, Joseph and Molnar have each signed an Employee Statement of Acknowledgment Regarding Protected Health Information, form DOC 3492.  (DPFOF ¶¶ 77, 95,109 and 142.)

While it is possible for escorting security officers to overhear conversations between HSU staff and inmates in an HSU examination room, escorting officers are trained to disregard and not listen to such conversations, and to not repeat anything they might hear. (DPFOF ¶ 78.) The most efficient way to communicate information about an inmate's medical condition is at his medical appointment, where he may ask follow-up questions. (DPFOF ¶ 79.)

In her position at RCI, defendant Nygren does not set, nor does she have any control over, security policy at the institution. (DPFOF ¶ 82.) Defendant Nygren is not a member of the RCI Security Department and has no expertise in the area of prison security to secondguess determinations concerning an inmate's security needs, including whether he safely may be unescorted during a medical appointment. (DPFOF ¶¶ 83 and 86.)

Defendant Nygren became aware that the plaintiff had complained about the presence of security officers in the examining room during his HSU appointments. (DPFOF ¶ 87.) As a result, she responded to the plaintiff's concerns by sending him a memorandum dated September 7, 2005, which stated:

> I have reviewed your letter dated 8/23/05. As a segregation inmate you are to be accompanied by an officer whenever you are out of your cell. This includes visits to the HSU. All correctional officers are aware that medical information is confidential and disciplinary action could be taken if they violate this work rule. If you have any further concerns, please refer to the information sent to you by Ms. LaBelle.

(DPFOF ¶ 88.)

13

In the course of defendant Nygren's duties she relies upon DOC Health Services Policy/Procedure (P&P) 500:01 which provides that a DOC employee without a job-related need to know protected health information may not disclose such information to any individual or entity. (DPFOF ¶ 92 and 93.) Defendant Nygren has not disseminated medical information about the plaintiff except as necessary to carry out her official duties and has not informed other inmates of the plaintiff's medical condition. (DPFOF ¶¶ 94 and 98.) Defendant Nygren did not harm the plaintiff nor did she intend to do so. (DPFOF ¶ 99.)

In his position at RCI, defendant Joseph does not set, nor does he have any control over, security policy at the institution. (DPFOF ¶ 100.) Defendant Joseph is not a member of the RCI Security Department and he has no expertise in the area of prison security to secondguess determinations concerning an inmate's security needs. (DPFOF ¶¶ 101 and 104.) Except as necessary to carry out his official duties, defendant Joseph has not disseminated medical information about the plaintiff nor has he informed other inmates of the plaintiff's medical condition. (DPFOF ¶¶ 108 and 112.) Defendant Joseph did not intend to injure the plaintiff nor was he indifferent to the plaintiff's welfare. (DPFOF ¶ 113.)

During defendant Molnar's period of employment at RCI, he has become familiar with the institution's security policy and he is a member of the RCI Security Department. (DPFOF ¶¶ 114 and 115.) Defendant Molnar has no control over security policy at DOC institutions other than RCI, and he does not set security policy at those

14

institutions.  (DPFOF ¶ 117.)  Inmates in program segregation and disciplinary separation status have special security needs which differ from those inmates in the general population because they have demonstrated that they are unwilling to conform to the disciplinary rules which govern inmate behavior.  (DPFOF ¶ 118.)  Inmates in program segregation and disciplinary separation have been found guilty of committing violations of the prison disciplinary code which may implicate the safety of other inmates and/or staff, as well as good order within the institution.  (DPFOF ¶ 119.) Thus, these inmates have peculiar security needs which require them to be escorted by security staff and to be in mechanical restraints while they are out of their cells. (DPFOF ¶¶ 120 and 122; RCI Security Procedure 2015, page 4.)

The plaintiff's DOC-120 face card, which contains information about the plaintiff including his institutional assignments and his disciplinary offenses, reveals that the plaintiff was transferred to RCI on August 3, 2005, and remained there until his transfer to GBCI on July 20, 2006.  (DPFOF ¶ 125.)  In addition, the face card shows that, since his admission to the prison system on February 8, 2000, he has had problematic adjustment during his prison confinement, including numerous dispositions of program segregation and disciplinary separation.  (DPFOF ¶¶ 125, 126, and 127.)  Further, except for a short period of control segregation in May 2006, the plaintiff's entire period of confinement at RCI was spent in either disciplinary separation or adjustment segregation.  (DPFOF ¶¶ 51 and 125.)

15

While the plaintiff was at RCI in segregation and disciplinary separation status, he was required to be escorted by security staff in mechanical restraints when he was outside of his cell on trips to the HSU at RCI for medical appointments. (DPFOF ¶ 130.) The plaintiff's history of violence, unpredictability, and other poor adjustment indicates that his particular security needs required such an escort and mechanical restraints at all times while he was out of his cell for medical appointments in the HSU. (DPFOF ¶ 131.) Inmates such as the plaintiff who are placed in mechanical restraints also require a security staff escort because they still pose safety and security risks or may be unable to protect themselves in the event of a fall or attack by another inmate. (DPFOF ¶¶ 132-135.)

Requiring escorting security officers to remain in close proximity to disciplinary status inmates during medical appointments in the HSU is not intended to humiliate, embarrass or punish the inmate. (DPFOF ¶ 144.) Stationing an escorting security officer outside the door while a medical appointment is taking place between HSU staff and a disciplinary status inmate is not an easy or penologically wise alternative to having the escorting officer in close proximity to

the inmate in the examining room. (DPFOF ¶ 145.)

Having the escorting officer outside the examination room would prevent the officer from making physical contact with the inmate in time to prevent injury to HSU staff and damage to HSU equipment if the inmate becomes aggressive. (DPFOF ¶ 146.) Close physical proximity between the inmate and the escorting officer during

16

a medical appointment may encourage the inmate not to act out in an aggressive manner and in turn this may avoid injury to staff and damage to property. (DPFOF ¶ 147.) In addition, close proximity between the inmate and the escorting officer during a medical appointment also may act as a deterrent to an inmate with a communicable disease to refrain from biting a HSU staff member in an attempt to spread the disease. (DPFOF ¶ 148.) There is also concern that because of past experience with an HSU staff member, an inmate at RCI may target that staff member for harm, because of a perception of inadequate care from that HSU staff member. (DPFOF ¶ 149.)

Defendant Molnar did not inform any inmates or security staff of the plaintiff's medical condition. (DPFOF ¶ 150.) He had no intention to injure the plaintiff, nor was he indifferent to the plaintiff's welfare. (DPFOF ¶ 151.)

In her position as Warden at RCI, defendant Champagne did not personally provide health care treatment to inmates. (DPFOF ¶ 152.) This was the responsibility of the HSU staff at RCI. (DPFOF ¶ 152.) Defendant Champagne was not present at any medical appointment which involved the plaintiff. (DPFOF ¶ 153.)

While defendant Champagne obtained information about the plaintiff's medical condition through the ICRS, she did not disseminate any such information except as necessary for ICRS purposes. (DPFOF ¶ 155.) As RCI Warden, defendant Champagne was not the appropriate reviewing authority for medical issues raised in the ICRS. (DPFOF ¶ 156; §§ DOC 310.03(2) and DOC 310.12.) Defendant Champagne did not make decisions on the merits concerning the plaintiff's

17

medical-related ICRS Offender Complaints. (DPFOF ¶ 156.) She did, however, make decisions on whether certain of the plaintiff's medical-related ICRS Offender Complaints had been properly rejected by the ICE under § DOC 310.11(5) and (6). (DPFOF ¶ 156.)

Defendant Champagne has not disseminated information concerning the plaintiff's medical condition except as required to fulfill her duties under the ICRS, and she has no intention of disseminating details of plaintiff's medical condition to anyone in the future, except as may be necessary to defend this case. (DPFOF ¶ ¶ 157-158.) While defendant Champagne supported the rejection of certain of the plaintiff's ICRS complaints, she did not intend to harm the plaintiff, nor was she indifferent to the plaintiff's welfare. (DPFOF ¶ 159.)

At no time did defendant Champagne laugh about or otherwise make light of the plaintiff's medical condition. (DPFOF ¶ 160.) Defendant Champagne has never participated in disseminating plaintiff's medical information to other inmates nor has she encouraged others to do so. (DPFOF ¶ 161.)

Like his predecessors before him, defendant Frank has assigned to his deputy, as designee, the duty of making the final decisions on ICRS Offender Complaints when appeals are taken from adverse institution level decisions. (DPFOF ¶ 162.) Defendant Frank does not participate in making such decisions on ICRS Offender Complaint appeals and he did not participate in making decisions on any such ICRS Offender Complaints filed by the plaintiff. (DPFOF ¶ 163.)

18

Defendant Frank does not personally supervise the day-to-day operation of DOC's adult correctional institutions; including RCI; nor does he personally supervise the conditions of confinement of DOC's inmates. (DPFOF ¶ 164.) Defendant Frank was not present at any medical appointment which involved the plaintiff and he did not participate in any determination regarding whether the plaintiff's security needs made it necessary for RCI security officers to be present during any of the plaintiff's medical appointments. (DPFOF ¶ 165-166.) These types of security decisions are made by institution security personnel who are in the best position to make them. (DPFOF ¶ 167.)

Prior to receiving the plaintiff's complaint in this lawsuit, defendant Frank did not know of plaintiff's medical condition, and defendant Frank had never disseminated details of his medical condition to anyone. (DPFOF ¶ 169.) Defendant Frank has no intention of disseminating details of the plaintiff's medical condition to anyone in the future. (DPFOF ¶ 170.) He did not intend to harm the plaintiff, nor was he indifferent to the plaintiff's welfare. (DPFOF ¶ 171.)

## B. Plaintiff's Proposed Findings of Fact

Plaintiff, who is HIV-positive, never signed an authorization or waiver giving the defendants permission to disclose his HIV-positive status. (Plaintiff's Proposed Findings of Fact [PPFOF] ¶¶ 10-11; Defendants' Response to PPFOF ¶ 10.) On August 8, 2005, the plaintiff was escorted from Waukesha West Segregation Unit at RCI to the HSU at RCI in handcuffs and a waist restraint by Correctional Officer (CO)

19

Ivy.  (PPFOF ¶ 14.)  He was placed in an exam room accompanied by CO Ivy. (PPFOF ¶ 15.)

When defendant Neil entered the room, she discussed the plaintiff's HIV-positive status with the plaintiff in the presence of CO Ivy.  (PPFOF ¶ 16.)  The plaintiff asked defendant Neil to "stop disclosing his medical info."  and to ask the guard to leave the room.  (PPFOF ¶ 17.)  Defendant Neil responded that it was RCI policy for the guard to remain in the room.  (PPFOF ¶ 18.)  After debating the issue, defendant Neil asked the guard to leave the room and observe through the window on the exam room door and CO Ivy complied.  (PPFOF ¶ 19.)

On August 10, 2005, the plaintiff again was transported from Waukesha West Segregation Unit to the HSU at RCI.  (PPFOF ¶ 20.)  He was escorted by CO Cooper and placed in waist restraints.  (PPFOF ¶ 20.)  CO Cooper accompanied the plaintiff into the exam room and, defendant Joseph discussed the plaintiff's HIV-positive status with the plaintiff in the presence of CO Cooper.  (PPFOF ¶ 21.)  The plaintiff asked defendant Joseph to stop disclosing his medical information in the presence of Cooper. (PPFOF ¶ 22.)  After other correctional officials entered the exam room and informed the plaintiff that "'this is (RCI) policy and you have no rights,'" defendant Joseph continued to disclose plaintiff's medical information in the presence of CO Cooper. (PPFOF ¶ 23.)

On September 23, 2005, the plaintiff was escorted by CO Joseph (not defendant Joseph) to HSU in handcuffs and waist restraints.  (PPFOF ¶ 24.)  CO Joseph

20

remained in the exam room with the plaintiff even when defendant Neil began to discuss plaintiff's medical information. (PPFOF ¶ 24.) In response to plaintiff's complaint, defendant Neil informed plaintiff that it was RCI policy for the guard to remain in the room and that he wouldn't be seen without a guard present. (PPFOF ¶ 24.)

The plaintiff claims that he wrote a letter to Warden Champagne asking her to stop the guards and RCI from violating his right to privacy in his medical information.[1] The warden did not respond to the letter. (PPFOF ¶ 26.) The plaintiff also claims that he wrote a letter to defendant Molnar and to defendant Nygren on August 23, 2005, requesting that they stop the guards and HSU and RCI from violating his right to privacy in his medical information. (PPFOF ¶ 27.) It is undisputed that he did not receive a response from defendant Molnar.[2] (PPFOF ¶ 27.) However, defendant Nygren sent a memorandum to the plaintiff in response to his letter in which she stated as follows:

> As a segregation inmate you are to be accompanied by an officer whenever you are out of your cell. This includes visits to the HSU. All correctional officers are aware that medical information is confidential and disciplinary action could be taken if they violate this work rule. If you have any further concerns, please refer to the information sent to you by Ms. LaBelle.

---

[1] Plaintiff has not produced a copy of the letter or any evidence that defendant Champagne received the letter. (Defs.' Resp. to PPFOF ¶ 26.)

[2] Plaintiff has not produced a copy of the letter or any evidence that defendant Molnar received the letter. (Defs.' Resp. to PPFOF ¶ 27.

(PPFOF ¶ 27.)

The plaintiff was not violent toward guards or HSU staff on any occasion between August 8, 2005, and September 23, 2005. (PPFOF ¶ 28.) No special request was made by HSU staff to have guards accompany the plaintiff in the exam rooms between August 8, 2005, and September 23, 2005. (PPFOF ¶ 31.)

Between 2005 and 2006, plaintiff was transported on at least two occasions to the University of Wisconsin (UW) Madison Hospital by RCI guards for treatment related to his HIV-positive condition. (PPFOF ¶¶ 35 and 38.) When he was examined at the UW Madison Hospital, the door to the exam room was closed and the guards remained outside and observed by looking at a television monitor. (PPFOF ¶ 39.)

### III. ANALYSIS

**A. Access to Courts Claim**

The plaintiff alleges that he was unable to file a notice of appeal in connection with the denial of his petition for a writ of habeas corpus because defendant Cramer refused to supply him with photocopies of case law and an AO 240 federal court form. The defendants argue that plaintiff is not entitled to proceed on this claim in federal court because he has failed to exhaust his administrative remedies on this claim as required under 42 U.S.C. § 1997e(a).

The Prison Litigation Reform Act of 1995 (PLRA), Pub. L. 104-134, 110 Stat. 1321 (1996), provides in pertinent part that:

22

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is a condition precedent to suit. *Dixon v. Page*, 291 F.3d 485, 488 (7th Cir. 2002) (citing *Perez v. Wisconsin Dept. of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999)). As such, it is a question for the court to decide, not the jury. *See Spruill v. Gillis*, 372 F.3d 218, 226 (3d Cir. 2004); *Hill v. Thalacker*, 399 F. Supp. 2d 925, 926 (W.D. Wis. 2005). Failure to exhaust is an affirmative defense that the defendants have the burden of pleading and proving. *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004).

In Wisconsin, inmates must file offender complaints through the ICRS (as outlined in Wis. Admin. Code ch. 310) in order to exhaust available administrative remedies. *See* Wis. Admins. Code §§ DOC 310.05 and 310.08.) The first step in this process requires an inmate to file an offender complaint with an ICE. *See* Wis. Admin. Code §§ DOC 310.09 and 310.11.)

The undisputed evidence presented by the defendants shows that, as of February 17, 2006, the date on which the complaint was filed in this action, the plaintiff had not filed an ICRS offender complaint relating to defendant Cramer's alleged refusal to provide him with requested legal material. The plaintiff has not submitted any response to the defendants' contention that he failed to exhaust his administrative remedies in connection with his access to court claim against defendant Cramer.

23

Because the defendants have met their burden of establishing that the plaintiff has not exhausted his administrative remedies relating to his access to court claim prior to filing the instant action, such claim must be dismissed pursuant to 42 U.S.C. § 1997e(a).

## B. Right to Privacy Claim

The defendants contend that the plaintiff's right to privacy claim must be dismissed because (1) the defendants' conduct does not violate either the Eighth Amendment or the Fourteenth Amendment; and (2) they are entitled to qualified immunity on the plaintiff's right to privacy claim. In addition, they argue that defendants Frank and Mikutis are protected from liability under 42 U.S.C. § 1983 based on lack of personal involvement and that the plaintiff's request for prospective relief[3] against the defendants should be dismissed as moot because he has been transferred from RCI to GBCI.

### 1. Prospective Relief

The plaintiff's right to privacy claim arises out of a security policy in place at RCI which requires security staff to escort segregation status inmates like plaintiff during their medical appointments. It is undisputed that the plaintiff has been transferred from RCI to GBCI and the defendants have presented testimony that there is no indication that plaintiff will be transferred back to RCI. Thus, the defendants argue that plaintiff

---

[3] Plaintiff requests a "preliminary injunction" and a declaratory judgment against the defendants. (Complaint at 39.)

24

is no longer subject to the challenged RCI policy and his prayer for injunctive and declaratory relief should be dismissed as moot.

"If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless 'he can demonstrate that he is likely to be retransferred.'" *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (quoting *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988)). Allegations that the inmate is likely to be retransferred may not be based on mere speculation. *Id.* (citing *Preiser v. Newkirk*, 422 U.S. 395, 403 (1975)).

As indicated above, the plaintiff has been transferred from RCI and is now at GBCI. Further, plaintiff has made no showing that he will again be subject to the alleged illegal policy at RCI. Indeed, the plaintiff does not even address the defendants' mootness argument in his response brief. Accordingly, the court finds that plaintiff's claims for injunctive relief must be dismissed as moot. For the same reasons, plaintiff's request for declaratory relief must also be dismissed. *See Higgason*, 83 F.3d at 811 (citing *Murphy v. Hunt*, 455 U.S. 478 (1982) (per curiam)).

## 2. Liability for Damages

The Supreme Court has recognized a qualified constitutional right to information privacy under the Fourteenth Amendment. *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977); *Franklin v. McCaughtry*, 110 Fed. Appx. 715, 718-19, 2004 WL 2202528 (7th Cir. 2004). Prisoners, on the other hand, have, at best, very limited privacy rights, *see Anderson v. Romero*, 72 F.3d 518, 522 (7th Cir. 1995), and the question of whether

25

"prisoners have any privacy rights in their prison medical records and treatment appears to be an open question" in this circuit. *Massey v. Helman*, 196 F.3d 727, 742 n.8 (7th Cir. 1999) (citing *Anderson*, 72 F.3d at 522-23).

Two circuits in recent years have recognized such a right. *See Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001) (acknowledging a constitutional right to privacy in one's medical information but stating that such right may be curtailed by policy or regulation shown to be "reasonably related to legitimate penological interests") (citing *Turner v. Safley*, 482 U.S. 78 (1987)); *Powell v. Schriver*, 175 F.3d 107, 112 (2d Cir. 1999) (prisoners have the right to maintain confidentiality of previously undisclosed medical information and prison officials can impinge on that right only to the extent that their actions are "reasonably related to legitimate penological interests").

The defendants argue that, according to existing case law from the Court of Appeals for the Seventh Circuit, the Eighth Amendment (and not the Fourteenth Amendment) would form the sole basis for any "privacy" right an inmate may have in his medical records. Specifically, the defendants point to the following dictum in the court's decision in *Anderson*, 72 F.3d at 523:

> Now, even if there is no such right, we can assume that certain disclosures of medical information or records would be actionable. But they would be actionable under the cruel and unusual punishments clause of the Eighth Amendment rather than under the due process clause of the Fourteenth. If prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history, their action might conceivably constitute the infliction of cruel and unusual punishment; . . . .

26

In this court's opinion, an equally plausible interpretation of the Seventh Circuit court's dictum is that the court was not foreclosing the Fourteenth Amendment as a basis for providing inmates with a constitutional right to the confidentiality of his or her medical information, but rather, it was recognizing that, irrespective of such a right, certain medical disclosures could be actionable if they rose to the level of cruel and unusual punishment under the Eighth Amendment.[4]

Thus, until the court of appeals rules otherwise, this court believes that the plaintiff's right to privacy claim must be analyzed under both the Eighth Amendment and the Fourteenth Amendment.

### (A). Eighth Amendment Claim

The plaintiff's claim concerns the disclosure by defendants Neil and Joseph of plaintiff's medical information relating to his HIV-positive status to plaintiff in the presence of escorting prison guards. The disclosures occurred as a result of the policy at RCI which requires security staff to be in close proximity when escorting disciplinary status inmates during their medical appointments.[5]

---

[4]Indeed, the court went on to give examples of such disclosures that would amount to cruel and unusual punishment:

> branding or tattooing HIV-positive inmates . . . , or making them wear a sign around their neck that read "I AM AN AIDS CARRIER!," would constitute cruel and unusual punishment. So too if employees of the prison, knowing that an inmate identified as HIV positive was a likely target of violence by other inmates yet indifferent to his fate, gratuitously revealed his HIV status to other inmates and a violent attack upon him ensued.

*Anderson*, 72 F.3d at 523 (citations omitted).

[5] The parties have entered into a stipulation that the plaintiff's right to privacy claim concerns only the dissemination and disclosure of medical information related to his HIV-positive condition. *(See* Defs.' Brief in Support, 16-17.)

27

In order to succeed on a claim regarding disclosure pursuant to this policy under the Eighth Amendment's cruel and unusual punishment clause, the plaintiff "must show that the state has created risk or inflicted pain pointlessly." *Johnson v. Phelan*, 69 F.3d 144, 147 (7th Cir. 1995). In other words, the plaintiff must show "calculated harassment unrelated to prison needs." *Johnson*, 69 F.3d at 147 (citing *Hudson v. Palmer*, 468 U.S. 517, 530 (1984)). "After incarceration, only the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Johnson*, 69 F.3d at 147 (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

The question then is whether the policy of requiring security staff to remain in close proximity to disciplinary status inmates like plaintiff during their medical examinations serves a function other than to inflict pain or harass the plaintiff. The plaintiff himself concedes that the defendants' actions and the policy itself do not rise to the level of a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *(See* Pl.'s Reply Brief to Defs.' Resp., 2.) Further, all of the defendants testified that they did not intend to harm the plaintiff nor were they indifferent to his welfare and such testimony was unchallenged by the plaintiff.

The record also demonstrates that the requirement that disciplinary status inmates have an escort during their medical appointments serves a security function. According to the undisputed testimony of RCI Security Director Molnar, this requirement protects the safety of HSU personnel, other inmates, and expensive HSU

28

property. This is so because inmates such as plaintiff who are in disciplinary status, have shown an unwillingness to abide by disciplinary rules and often have a history of violence and poor adjustment which requires heightened security needs such as mechanical restraints and escorts at all times when the inmate is out of his cell. Defendant Molnar's undisputed testimony also demonstrates that security staff is required to be present in the HSU exam room with disciplinary status inmates because their presence reduces the likelihood of aggressive behavior and enables the security officer to make physical contact with the inmate in the event the inmate attempts to harm the HSU staff member or HSU equipment.

In sum, the plaintiff has failed to show that the dissemination of plaintiff's medical information by the defendants pursuant to the policy requiring inmates like plaintiff to have an escort in the HSU exam room was solely intended to inflict pain or to harass the plaintiff. Hence, the defendants' conduct pursuant to that policy cannot be said to run afoul of the Eighth Amendment's prohibition against cruel and unusual punishment.

### (B). Fourteenth Amendment Claim

As noted previously, the Seventh Circuit has not specifically recognized that an HIV-positive inmate has a right to privacy in his medical information. This right has been recognized in two other circuits. *See Delie*, 257 F.3d 309 (3d Cir. 2001); and *Powell*, 175 F.3d 107 (2d Cir. 1999). While the Seventh Circuit has not had an opportunity to resolve the debate over the constitutional stature of an inmate's medical information, it has recognized that non-prisoners have a qualified right to the

29

confidentiality of medical records and medical communications. *Anderson*, 72 F.3d at 522 (citing *Pesce v. J. Sterling Morton High School*, 830 F.2d 789, 795-98 (7th Cir. 1987)). In addition, the court determined in two other cases that prisoners retain a limited right to privacy. *Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994); *Smith v. Fairman*, 678 F.2d 52 (7th Cir. 1982) (per curiam). However, the right in question in those cases was a right against humiliating searches or surveillance of prisoners of one sex by guards of the opposite sex, rather than against the disclosure of a prisoner's medical information.

Nevertheless, in light of the Seventh Circuit's recognition that prisoners have a limited right to privacy and the reasoning of the Second Circuit in *Powell*, 175 F.3d 107, and the Third Circuit in *Delie*, 257 F.3d 309, the court concludes that there is a Fourteenth Amendment right to privacy that protects medical information concerning an inmate's HIV-status from unjustified disclosures by governmental actors. However, as noted by the courts in both *Delie* and *Powell*, a prisoner does not enjoy the right to privacy of his medical information to the same extent as a free citizen. *Delie*, 257 F.3d at 317; and *Powell*, 175 F.3d at 112. Specifically, an inmate's constitutional right to privacy may be impinged by a policy or regulation that is shown to be "reasonably related to legitimate penological interests." *Delie*, 257 F.3d at 317 (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Powell*, 175 F.3d at 112 (citing *Turner*, 482 U.S. at 89). "Courts must respect the administrative concerns underlying a prison regulation,

30

without requiring proof that the regulation is the least restrictive means of addressing those concerns." *Delie*, 257 F.3d at 317.

It is undisputed that the RCI policy of requiring security staff to remain in close proximity to disciplinary status inmates even during their medical appointments in the HSU incidentally and necessarily affects disclosure of an inmate's medical information. Notwithstanding this intrusion, if the challenged RCI policy is reasonably related to a valid penological interest, there is no constitutional violation.

The defendants have presented testimony in the form of an affidavit from defendant Molnar, security director at RCI, establishing that the challenged RCI policy furthers the maintenance of security at the institution. Internal security has always been considered a legitimate policy goal of the penal system. *Childs v. Duckworth*, 705 F.2d 915, 920 (7th Cir. 1983) (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977)). While the plaintiff does not dispute that maintaining internal security is a valid penological interest, he argues that the policy in place at RCI is unreasonable because there is an obvious alternative to that policy which accommodates his privacy rights. In particular, the plaintiff attests that having a guard outside the exam room door is an obvious, easy alternative to the existing RCI policy which requires escorts to remain in the exam room with disciplinary status inmates.

The existence of obvious, easy alternatives to the challenged policy may be evidence that the regulation is unreasonable and an exaggerated response. *Thornburgh v. Abbott*, 490 U.S. 401, 418 (1989). If the inmate can point to an

31

alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Id.*

The problem with the plaintiff's assertion that a "cost-free" alternative to the existing policy exists is that it is not supported by any credible proof. The defendants produced competent evidence establishing that plaintiff's proposed alternative would have more than *de minimis* costs to prison security. They introduced the testimony of RCI security director Molnar which stated that having a guard outside a closed exam room door is not a valid or "obvious" alternative because such procedure does not take into account the need for an immediate response to protect HSU staff and property if the inmate turns violent and it ignores the fact that having close proximity between the disciplinary status inmate and the escorting officer acts as a deterrent to aggressive behavior.

Plaintiff attempts to dispute this testimony by arguing that the RCI policy is an over-exaggeration. Yet, plaintiff is not a security expert and he has not produced evidence from any person with qualifications in the area of prison security to controvert the defendants' evidence. Thus, the plaintiff has not sufficiently called into question the reasonableness of the relationship between the RCI policy and the penological interest of maintaining institutional security. Moreover, even if the court were to conclude that a genuine issue of material fact exists on this issue, the defendants are entitled to summary judgment pursuant to the doctrine of qualified immunity.

32

## (C). <u>Qualified Immunity</u>

Governmental officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether a defendant is entitled to qualified immunity for his actions is a question of law for the judge to decide. *Id.* at 818-20; *Llaguno v. Mingey*, 763 F.2d 1560, 1569 (7th Cir. 1985), *cert. dismissed*, 478 U.S. 1044 (1986). Determining whether a defense of qualified immunity is applicable involves a two-step test. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). First, the court is to decide whether "[t]aken in the light most favorable to the party asserting the injury," the "facts alleged" show the officer's conduct violated a constitutional right. *Id.* at 201. In the event that no constitutional right would have been violated if the allegations were established, there is no need for further analysis of the qualified immunity issue. *Id.*

However, if a violation could be demonstrated based on a favorable view of the parties' submissions, the analysis proceeds to the second step which requires that the court determine whether the right was clearly established. *Id.* Such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct

33

was unlawful in the situation he confronted." *Id.* at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

The plaintiff has the burden to show that the defendants violated his clearly-established rights. *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994).

> To meet [the clearly established law standard] we have "required case law which clearly and consistently recognized the constitutional right." . . . While cases involving the exact fact pattern at bar are unnecessary, case law in a closely analogous area is crucial to permit us to conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly.

*Lojuk v. Johnson*, 770 F.2d 619, 628 (7th Cir. 1985), *cert. denied*, 474 U.S. 1067 (1986).

As of August 2005, only three circuits had ruled on whether an inmate has a privacy right in his medical information. Two circuits recognized the existence of such a right, *Delie*, 257 F.3d 309 (3d Cir. 2001); and *Powell,* 175 F.3d 107 (2d Cir. 1999), and the other did not, *Doe v. Wigginton*, 21 F.3d 733, 740 (6th Cir. 1994). As the court has noted repeatedly in this decision, the issue remains an open question in this circuit. *Massey,* 196 F.3d 727. If the Seventh Circuit has not decided a particular issue and other circuits have reached conflicting outcomes, the right at issue is not considered clearly established. *See Donovan v. City of Milwaukee*, 17 F.3d 944, 953 (7th Cir. 1994) ("Because only two circuits had considered cases on point, reaching opposite results, we conclude that the relevant case law was still developing [and] the key issue in this case had not been clearly settled.") (internal quotations omitted); *see also Wilson*

34

*v. Layne*, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

Because the Seventh Circuit has not ruled on the issue and other circuits have reached differing results, this court is unable to conclude that the right to privacy protecting disclosure of plaintiff's HIV-positive status was clearly established as of August 2005 when the alleged unlawful conduct occurred. Thus, the defendants are entitled to qualified immunity on plaintiff's right to privacy claim under the Fourteenth Amendment.

Accordingly,

**IT IS ORDERED** that the defendants' "Motion for Summary Judgment" be and the same is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that plaintiff's "Motion for Summary Judgment" be and the same is hereby **DENIED**.

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED** on the merits.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this  5th  day of February, 2007.

BY THE COURT:

 s/ J. P. Stadtmueller
J. P. Stadtmueller
U.S. District Judge

35